IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION


ERIC PONDER                                                                                    PLAINTIFF

          V.                              Civil No. 5:15-cv-05022

SHERIFF KELLY CRADDUCK;
CATERING BY MARLINS; CAROLYN
ELLIS; SERGEANT SHARP; and
SERGEANT COGDILL                                                                        DEFENDANTS


**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

          This is a civil rights action filed by the Plaintiff, Eric Ponder, pursuant to 42 U.S.C. § 1983.

Plaintiff proceeds *pro se* and *in forma pauperis.*

          Plaintiff is currently incarcerated in the Ouachita River Correctional Unit of the Arkansas

Department of Correction (ADC).  At the times relevant to this case, Plaintiff was incarcerated in

the Benton County Detention Center (BCDC).  While incarcerated there, Plaintiff maintains he was

denied an adequate soft diet required because he had almost no teeth.

          Pending before the Court for decision are two Motions for Summary Judgment.  First, the

Separate Benton County Defendants, Sheriff Cradduck, Sergeant Sharp, and Sergeant Cogbill, filed

a Motion for Summary Judgment (Doc. 36).  Second, Separate Defendants Catering by Marlins

(CBM) and Carolyn Ellis filed a Motion for Summary Judgment (Doc. 39).  A hearing was held on

these Motions on January 19, 2016, to allow the Plaintiff to respond to the Motions by testifying.

Subsequently, Plaintiff also filed a written response (Doc. 50).  CBM filed a reply (Doc. 51).  The

Motions are now ready for decision.

-1-

## I. Background

In 2007, Plaintiff was diagnosed with diabetes. *County Defendants' Exhibit* (hereinafter *County Ex.*) B at 14.[1] Plaintiff's diabetes is controlled with medication, Metformin. *Id.* at 14-15. When he was first diagnosed, he was advised to "lose weight or die." *Id.* at 15. At the time, Plaintiff weighed 380 pounds. *Id.* Over approximately two years, Plaintiff lost about one hundred pounds. *Id.*

Plaintiff was booked into the BCDC on July 12, 2014. *County Ex.* A-1 at 10. He remained incarcerated there until February 2, 2015, when he was transferred to the ADC.

When he was booked in, Plaintiff indicated he was on a diabetic diet. *Id.* at 10. Having notified the jail that he needed a diabetic diet, Plaintiff assumed he was placed on one. The booking medical questionnaire also noted that Plaintiff had "bad teeth." *Id.*

Plaintiff believes he first asked the nurse for a soft diet in August of 2014. *County Defts' Ex.* B at 44-45. He was instructed he would have to ask to see the providers. *Id.* at 45. Plaintiff testified he was seen by a nurse practitioner who merely looked at his teeth and that was it. *Id.*

When nothing happened, he submitted a written request on October 30, 2014 stating that he did not have a lot of teeth and asking to be put on a soft diet. *County Defts' Ex.* A-1 at 25; *County Defts' Ex.* B at 46. Nurse T. Ray approved his request for a soft diet. *Id.*

On November 11, 2014, Plaintiff complained that he kept getting potatoes that he was unable to chew. *County Ex.* A-1 at 28. In response, he was told "they," presumably the kitchen, would take care of it "the best they can." *Id.*

---

[1]The page reference is to the Case Management/Electronic Case Filing (CM/ECF) page located at the top right hand side of the page.

On December 9, 2014, Plaintiff submitted a grievance stating that he could not eat the potatoes because they were hard. *Id.* at 34. He requested a soft diet. *Id.* He submitted another grievance the following day saying that he was on a soft diet but that the foods on it were hard, or not soft enough for him to eat. *Id.* at 35. In response, he was told by the medical staff that they had no authority over what food was put on the tray. *Id.*

On December 14, 2014, Plaintiff submitted another grievance about the soft diet. *County Ex.* A-1 at 37. Sergeant Sharp said he would look into the diet Plaintiff was being provided. *Id.*

Plaintiff testified he could not eat some of the food provided to him. For example, he indicated he could not eat the breakfast food, the hard chopped up fruit he generally received, corn chips, scalloped potatoes, cookies, bologna, and cheese. *County Ex.* B at 32 & 51. He testified there was something on "pretty much" every meal that he was unable to eat. *Id.* at 51. Plaintiff further testified that he weighed 270 pounds when he was booked into the BCDC, and only 208 pounds during intake at the ADC approximately six and one half months later. *See Id.* at 39.

At the time of the hearing, Plaintiff testified he weighed 240 pounds. As a result of the weight loss, Plaintiff testified his blood pressure has gotten worse and his immune system is "messed up." *County Ex.* B at 40-41.

Plaintiff testified in his deposition that the only significant difference between a regular diet tray and a soft diet tray was that once a week or so, he would receive steamed vegetables. *County Defts' Ex.* B at 80. Other than that, he indicate it was "pretty much the same tray." *Id.*

Defendants point out that Plaintiff asked whether beef jerky could be made available at

-3-

the commissary and had ordered Doritos and other hard items.  Plaintiff indicated he did on one occasion order Doritos for himself but that he was unable to eat them.  Plaintiff testified that the other orders of hard food items from the commissary were for other inmates who had negative balances on their own accounts.  Plaintiff allowed them to use his account so that their money could be used for commissary items rather than go towards paying off their negative balances.

On January 16, 2015, for the first time, Plaintiff testified he asked the nurse to be placed on a diabetic diet.  *County Ex.* A-1 at 43.  Plaintiff indicated that until he saw the diabetic diet tray of another inmate he had assumed he was on a diabetic diet.

On January 18, 2015, Plaintiff submitted a grievance saying that he needed a soft diabetic tray.  *County Ex.* A-1 at 46.  He said he needed a soft diabetic diet, not one diet or the other.  *Id.* In response, he was told the request would need to be addressed by the medical staff.  Plaintiff contacted the nurses and was told he would be put on a soft diet, but that medical staff did not determine what foods CBM considered to constitute a soft diet.  In Plaintiff's view, the food he was provided did not constitute a soft diet.

With respect to Sheriff Cradduck, Ponder testified that he assumed the Sheriff had to approve the meals and the contract with CBM.  Plaintiff did not have any evidence suggesting the Sheriff was even aware of Plaintiff's concerns, let alone be involved in them.  Plaintiff did write one letter to the Sheriff, but he never received a response.  Plaintiff did not believe his grievances were being given to CBM.

With respect to Sergeant Sharp, Plaintiff testified that he did not have any personal involvement in the dietary decisions.  Plaintiff testified, however, that Sharp was the officer who

-4-

reviewed grievances.  According to Plaintiff, Sharp did not investigate Plaintiff's grievances regarding the diet he was provided and did no reports about Plaintiff's situation.

With respect to Sergeant Cogdill, Plaintiff testified he did not interfere with the provision of medical care to the Plaintiff.  Cogdill did make comments, however, that were insulting and disrespectful.  Plaintiff states he was not doing his job and did not show the Plaintiff any respect. Plaintiff contends that law enforcement officers should be held to a higher standard.

By affidavit, Carolyn Ellis indicates she is the District Manager for CBM.  *CBM's Ex.* B at ¶ 4.  She indicates she is familiar with the custom, policy and practice of the kitchen operations and food service of the BCDC.  *Id.* at ¶ 5.  At the time of Plaintiff's incarceration, she indicates a cold menu was utilized for BCDC inmates.  *Id.* at ¶ 6.

Ellis indicates that CBM had certain standard menus including the regular menu, a 2800 calorie diabetic menu, a 2500 calorie diabetic menu, and a heart healthy menu.  *Id.* at ¶ 10.  There was no prepared soft diet menu.  Ellis asserts that other special dietary needs, such as the need for a soft diet, were accommodated as ordered by medical staff and created and approved by the company dietician.  *Id.* at ¶ 11.

According to Ellis, the regular menu contained mostly soft food.  *Id.* at 11.  CBM did not have a separate soft diet menu; instead, substitutions were made for certain items on the regular menu such as steamed vegetables in place of celery and carrots and potato salad or pasta salad in place of chips.  *Id.*  Certain hard foods such as cookies and cereal were left on the trays because they were served with milk.  *Id.* at ¶ 12.  She indicated the fresh fruit on the menu consisted of an orange.  *Id.*  Ellis admits that Plaintiff may have occasionally received non-soft items on his tray due to oversight.  *Id.* at ¶ 19.

-5-

Attached to Ellis' affidavit as exhibits are copies of the regular three week cold menu and the special diet menus. *CBM Ex.* B-1. Nothing was submitted showing the appropriate substitutions for hard food.

According to Ellis, the "policy followed by the CBM staff was to only make changes to an inmate's diet/menu pursuant to orders from the medical staff. Pursuant to such policy, the CBM staff did not change an inmate's diet without an order from medical staff." *CBM Ex.* B at ¶ 14. All special needs trays are prepared by CBM staff. *Id.* at ¶ 16. "The CBM staff ensures the menus are followed, portion sizes are proper, according to the approved menu, and the special diet trays are made per the special diet menu." *Id.* at ¶ 17.

If an inmate had a problem with his tray, the inmate would often inform the deputy. If CBM staff were notified in time, the issue would be corrected. *CBM EX.* B at ¶ 18. CBM and Ellis did not "regularly receive the inmate grievances submitted at the kiosk. Occasionally, the kitchen manager would receive a copy of a kitchen related grievance." *Id.* at ¶ 20.

Ellis indicates they did not receive copies of any of Plaintiff's 2014 grievances. "The only grievances of record from Mr. Ponder in the kitchen manager's file are the January 19, 2015 grievance and the January 21, 2015 grievance, each discussing a diabetic soft diet, which had to be approved and ordered by medical staff." *CBM Ex.* B at ¶ 21. Since Plaintiff was already on a diabetic soft diet and CBM did not receive an order from medical staff changing the diet, CBM did not address these grievances. *Id.* at ¶ 22.

By affidavit, Justin Barthel, dietary director for CBM, indicates the BCDC menus were created by a CBM company dietician. *CBM Ex.* C at ¶ 5. Food substitutions are approved by

-6-

a CBM company dietician.  *Id.* at ¶ 6.  Barthel also indicates that "CBM staff has access to a company dietician for any menu related questions or concerns."  *Id.* at ¶ 7.

Plaintiff advised the Court that he wanted to dismiss his individual capacity claim against Ellis.  When questioned, Plaintiff testified that he could not point to a specific unconstitutional custom or policy, but rather it was the inaction in the face of his complaints.  He testified he was unable to get a resolution regarding his need for a soft diet.  He indicated he was in a never ending cycle of being told to ask medical; only to be told by medical that they had no control over the actual content of the diet trays which was determined by CBM; and then to be told CBM would not make any changes without medical authorizing it.

## II.  Applicable Standard

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "[A] genuine issue of material fact exists if: (1) there is a dispute of fact; (2) the disputed fact is material to the outcome of the case; and (3) the dispute is genuine, that is, a reasonable jury could return a verdict for either party." *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.*, 49 F.3d 399, 401 (8th Cir. 1995).

The moving party has the burden of showing the absence of a genuine issue of material fact and that they are entitled to judgment as a matter of law, but the nonmoving party may not rest upon mere denials or allegations in the pleadings and must set forth specific facts to raise a genuine issue for trial.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  The Court must view all evidence and inferences in a light most favorable to the nonmoving party.  *See McCleary v. ReliaStar Life Ins.*

-7-

*Co.*, 682 F.3d 1116, 1119 (8th Cir. 2012).  However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a Court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### III.  Discussion

#### A.  Section 1983

Section 1983 provides a federal cause of action for the deprivation, under color of law, of a citizen's "rights, privileges, or immunities secured by the Constitution and laws" of the United States.  In order to state a claim under 42 U.S.C. § 1983, a plaintiff must allege that the defendant acted under color of state law and that he violated a right secured by the Constitution. *West v. Atkins*, 487 U.S. 42 (1988); *Dunham v. Wadley*, 195 F.3d 1007, 1009 (8th Cir. 1999). The deprivation must be intentional; mere negligence will not suffice to state a claim for deprivation of a constitutional right under § 1983.  *Daniels v. Williams*, 474 U.S. 327 (1986); *Davidson v. Cannon*, 474 U.S. 344 (1986).

#### B.  Right to an Adequate Diet

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being."  *County of Sacramento v. Lewis*, 523 U.S. 833, 851 (1998)(citation omitted).  The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones.  *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994).

The Eighth Amendment to the United States Constitution prohibits the imposition of cruel and unusual punishment.  U.S. Const. amend. VIII.  The Cruel and Unusual Punishment

Clause of the Eighth Amendment forbids conditions that involve the "wanton and unnecessary infliction of pain," or are "grossly disproportionate to the severity of the crime." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).

A prisoner alleging an Eighth Amendment violation must prove both an objective and subjective element. *See Revels v. Vincenz*, 382 F.3d 870, 875 (8th Cir. 2004) (*citing Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). "The defendant's conduct must objectively rise to the level of a constitutional violation by depriving the plaintiff of the minimal civilized measure of life's necessities. The defendants' conduct must also reflect a subjective state of mind evincing deliberate indifference to the health or safety of the prisoner." *Revels*, 382 F.3d at 875 (citations and internal quotation marks omitted). Deliberate indifference is established when the plaintiff shows "the defendant was substantially aware of but disregarded an excessive risk to inmate health or safety." *Revels,* 382 F.3d at 875. The standards against which a court measures prison conditions are "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble*, 429 U.S. 97, 102 (1976); *see also Butler v. Fletcher*, 465 F.3d 340, 345 (8th Cir. 2006) (deliberate indifference standard applies to claims brought by pretrial detainees that prison officials failed to provide adequate food, clothing, shelter, etc.).

The Eighth Amendment's prohibition against cruel and unusual punishment is violated if an inmate is not provided with meals adequate to maintain his health. *See e.g., Keenan v. Hall*, 83 F.3d 1083, 1091 (9th Cir. 1996); *Wishon v. Gammon*, 978 F.2d 446, 449 (8th Cir. 1992) (prisoners have a right to nutritionally adequate food); *Campbell v. Cauthron*, 623 F.2d 503, 508 (8th Cir. 1980) (prisoners are guaranteed a reasonably adequate diet). To prevail on an Eighth

-9-

Amendment claim Plaintiff must show the Defendants were deliberately indifferent to his dietary needs. *Wishon v. Gammon*, 978 F.2d 446 (8th Cir. 1992).

## C. Motions for Summary Judgment

The County Defendants maintain they are entitled to summary judgment on the following grounds: (1) there is no proof of personal involvement on the part of Sheriff Cradduck; (2) Sergeant Sharp had no personal involvement in the dietary decisions made for the Plaintiff; (3) Sergeant Cogbill did not violate the Plaintiff's constitutional rights when joking or acting in an unprofessional way; (4) the Defendants are entitled to the protections of qualified immunity; and, (5) there is no basis for official capacity liability. (Doc. 36)

The CBM Defendants contend they are entitled to summary judgment for the following reasons: (1) there are no allegations against CBM and Carolyn Ellis in their individual capacities; (2) Plaintiff did not exhaust his administrative remedies as to a soft diet tray; and, (3) the allegations that the soft food diet was not soft enough fail to state an official capacity claim. (Doc. 39)

### 1. Individual & Official Liability

Under § 1983, a defendant may be sued in either his individual capacity, or in his official capacity, or claims may be stated against a defendant in both his individual and his official capacities. In *Gorman v. Bartch*, 152 F.3d 907 (8th Cir. 1998), the Eighth Circuit discussed the distinction between individual and official capacity suits. As explained by the *Gorman* case:

> Claims against government actors in their individual capacities differ from those in their official capacities as to the type of conduct that is actionable and as to the type of defense that is available. *See Hafer v. Melo*, 502 U.S. 21, 112 S. Ct. 358, 116 L. Ed. 2d 301 (1991). Claims against individuals in their official capacities are equivalent to claims against the entity for which they work; they require proof that a policy or custom of the entity violated the plaintiff's rights, and the only

-10-

type of immunity available is one belonging to the entity itself. *Id.* 502 U.S. at 24-27, 112 S. Ct. at 361-62 (1991). Personal capacity claims, on the other hand, are those which allege personal liability for individual actions by officials in the course of their duties; these claims do not require proof of any policy and qualified immunity may be raised as a defense. *Id.* 502 U.S. at 25-27, 112 S. Ct. at 362.

*Gorman*, 152 F.3d at 914.

I agree that there is no evidence that Sheriff Cradduck was personally involved in making dietary decisions for the Plaintiff. Likewise, it appears Carolyn Ellis was not personally involved in making dietary decisions for the Plaintiff.

The only involvement on Sergeant Sharp's part was his response to a single grievance in which he indicated he would look into the Plaintiff's claim that he could not eat the "hard food" he was being given. The record does not indicate whether Sergeant Sharp did anything in response to the grievance. If he did not, his failure would at most constitute negligence. If he conducted an investigation and was satisfied with the result, this would not show any evidence of deliberate indifference on his part. As no individual capacity remains, qualified immunity is not an issue. *Serna v. Goodno*, 567 F.3d 944, 952 (8th Cir. 2009) ("Qualified immunity only applies to claims against public officials in their individual capacities.").

Under § 1983, a governmental entity may not be held vicariously liable for the unconstitutional acts of employees. A governmental entity, here Benton County, may be held liable for the unconstitutional acts of its officials or employees only when those acts implement or execute an unconstitutional policy or custom. *Doe v. Washington County*, 150 F.3d 920, 922 (8th Cir. 1998).

Thus, Benton County would be liable for the Defendants' conduct only if it had a policy or custom that caused Plaintiff's injury. *See Board of County Comm'rs v. Brown*, 520 U.S. 397

-11-

(1997).   In the absence of a written policy, Plaintiff must identify a pattern of widespread unconstitutional conduct that was so pervasive and well-settled that it had the effect of law.  *See Jane Doe A v. Special Sch. Dist. of St. Louis County*, 901 F.2d 642, 646 (8th Cir. 1990).  Plaintiff must show that the County "through its deliberate conduct ... was the 'moving force' behind the injury alleged."  *Brown*, 117 S. Ct. at 1388.

"[I]naction or laxness can constitute government custom if it is permanent and well settled."  *Tilson v. Forrest City Police Dept.*, 28 F.3d 802, 807 (8th Cir. 1994) (citation omitted). "Such a government custom of laxness or inaction must be the moving force behind the constitutional violation."  *Id.*  The County may be held liable "but only where a [county's] inaction reflects a deliberate indifference to the constitutional rights of the citizenry, such that inadequate training or supervision actually represents the [County's] 'policy.'"  *Szabla v. City of Brooklyn Park, Minnesota*, 486 F.3d 385, 392 (8th Cir. 2007).

Based on the summary judgment record, there are questions of fact as to whether the inaction of laxness of Benton County resulted in Plaintiff being denied a diet adequate to maintain his health.  Plaintiff testified that after he asked for a diabetic diet he received it.  When being booked in, however, he was asked if he was on any special diet, and he listed a diabetic diet.  In response, it appears that no action was taken to ensure that he received a diabetic diet. Even though he listed a medically necessary diet on the medical intake questionnaire, no action was taken by the County Defendants to place him on such a diet or to evaluate his need for such a diet.

Regarding Plaintiff's request for a soft diet, the summary judgment record indicates there is a complete lack of communication between the BCDC staff, it's medical staff, and the CBM staff.  Each essentially pointed to another as being responsible for solving the Plaintiff's need

-12-

for a soft food diet, and no one took any action to ensure that Plaintiff could consume the food he was being provided. It is undisputed that Plaintiff had few, if any, teeth. There is no dispute that Plaintiff submitted repeated grievances indicating his inability to chew certain food he was provided. Even with being able to supplement the diet with commissary purchases, Plaintiff lost a significant amount of weight, from 280 pounds down to 208 pounds, during his incarceration at the BCDC. Defendants' argument that what was in effect a forced diet resulted in Plaintiff being at a healthier weight is unavailing. No one was monitoring his weight loss or ensuring that the Plaintiff received the proper vitamins and nutrients to maintain good health.

### 2. Humiliation and Unprofessional Conduct

Plaintiff maintains that Sergeant Cogbill made comments that were hurtful and disrespectful. This is insufficient to state a claim of constitutional dimension.

"Verbal threats do not constitute a constitutional violation." *Martin v. Sargent*, 780 F.2d 1334, 1339 (8th Cir. 1985). Similarly, taunts, name calling, and the use of offensive language does not state a claim of constitutional dimension. *McDowell v. Jones*, 990 F.2d 433, 434 (8th Cir. 1993) (inmate's claims of general harassment and of verbal harassment were not actionable under § 1983); *O'Donnell v. Thomas*, 826 F.2d 788, 790 (8th Cir. 1987) (verbal threats and abuse by jail officials did not rise to the level of a constitutional violation); *Martin*, 780 F.2d at 1338-1339 (being called an obscene name and threatened with adverse consequences unless he cut his hair and shaved does not state a claim of constitutional dimension); *Black Spotted Horse v. Else*, 767 F.2d 516, 517 (8th Cir. 1985) (use of racially offensive language in dealing with a prisoner does not, by itself, state a claim). *Cf. Burton v. Livingston*, 791 F.2d 97, 100-101 (8th Cir. 1986) (A claim was stated where the prisoner alleged "that a prison guard, without

-13-

provocation, and for the apparent purpose of retaliating against the prisoner's exercise of his rights in petitioning a federal court for redress, terrorized him with threats of death.").

## IV.  Conclusion

For the reasons stated above, I recommend that:

the Summary Judgment Motion filed by the Benton County Defendants (Doc. 36) be **GRANTED IN PART AND DENIED IN PART.**  Specifically, it should be granted with respect to all claims against Sergeant Cogbill and all individual capacity claims against Sheriff Cradduck and Sergeant Sharp.  The official capacity claims against Sheriff Cradduck and Sergeant Sharp remain for later resolution; and,

the Summary Judgment Motion filed by CBM (Doc. 39) be **GRANTED IN PART AND DENIED IN PART**.  Specifically, all individual liability claims should be dismissed.  The official capacity claims remain for later resolution.

**The parties have fourteen (14) days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 14th day of June, 2016.

/s/ Mark E. Ford
HON. MARK E. FORD
UNITED STATES MAGISTRATE JUDGE

-14-

AO72A
(Rev. 8/82)